**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALEANDRO LOPEZ, individually and on behalf of similarly situated individuals, | ) ) ) | |
| *Plaintiff*, | ) ) | No. |
| v. | ) ) | |
| ENGEL & VOLKERS, ENGEL & VOLKERS AMERICAS, INC., LIVE & PLAY LLC D/B/A ENGEL & VOELKERS CHICAGO, JENNIFER AMES CHICAGO, INC., D/B/A AMES GROUP CHICAGO, SIDE, INC., THE KEYES COMPANY, and ILLUSTRATED PROPERTIES, LLC, | ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| *Defendants*. | ) ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff, Aleandro Lopez, both individually and on behalf of similarly situated individuals, brings this Class Action Complaint against Defendants, Engel & Volkers, Engel & Volkers Americas, Inc., Live & Play LLC d/b/a Engel & Voelkers Chicago, and Jennifer Ames Chicago, INC., d/b/a Ames Group Chicago (together "Engel & Volkers"); Side Inc., ("Side"); and The Keyes Company and Illustrated Properties, LLC (together "Keyes") (collectively, "Defendants"), and alleges as follows based on personal knowledge as to his own acts and experiences, and as to all other matters, on information and belief, including an investigation by his attorneys.

### NATURE OF THE ACTION

1.      This lawsuit is brought against Defendants Engel & Volkers, Side, and Keyes – each of which is among the largest residential real estate brokerages in the country by sales volume – for engaging in and facilitating a conspiracy that has perpetuated anticompetitive measures in

the real estate broker services market within Illinois and nationwide. Defendants and their co-conspirators adopted and implemented anticompetitive practices that harmed consumers and homebuyers by, among other things, increasing and artificially sustaining the commissions paid to real estate brokers as part of residential real estate transactions. Because brokers' commissions are incorporated into the price of a home, Defendants' anticompetitive practices have burdened homebuyers nationwide with increased home prices and unnecessarily high costs in residential real estate transactions.

2.     Defendants and their co-conspirators are members of the National Association of Realtors® ("NAR"), a national trade association that offers advantages to its members, including access to the primary Multiple Listing Services ("MLSs") with detailed information on properties available for sale. NAR and its members establish and enforces rules, policies, and practices that are adopted by NAR's 1,400+ local associations and their affiliated MLSs ("NAR MLSs"). According to NAR's website, more than 1.5 million real estate professionals across thousands of different brokerages and real estate firms are members of NAR.[1]

3.     The typical residential real estate transaction includes a real estate professional on the buy-side ("buyer-agent") and a sell-side broker ("seller-agent" or "seller-broker") that work for brokerage firms like Defendants and are paid commissions based on a percentage of the home's sale price. The seller-broker lists the seller's property on an MLS, while the buyer-agent searches the MLS to find properties to propose to their buyer. The vast majority of residential real estate transactions are facilitated through listings made available on an MLS.

4.     An MLS is essentially a searchable database that serves as a marketplace for properties that are listed for sale. Both the supply side and the demand side of the housing market

---

[1] https://www.nar.realtor/

depend on MLSs. In order to effectively market and sell a property, a seller-broker has little choice but to list that property on an MLS because that is where buyer-agents search for properties. Similarly, in order to understand the marketplace and determine which homes are listed for sale, a buyer-agent has little choice but to search an MLS for properties. In this way, MLSs are the digital gateway to homebuying and selling and comparatively few sales occur off of MLSs. According to the Department of Justice ("DOJ") MLSs are a joint venture among competing brokers to facilitate the publishing and sharing of information about homes for sale in a geographic area.[2]

5.      There are numerous NAR MLSs and each serves certain geographic areas. According to the DOJ, membership of an MLS is generally comprised of nearly all residential real estate brokers and their affiliated agents in an MLS's service area. In each area an MLS serves, the MLS will include or "list" the vast majority of homes that are for sale through a residential real estate broker in that area. In most areas, the local MLS provides the most up-to-date, accurate, and comprehensive compilation of the area's home listings.

6.      There are hundreds of MLSs in the United States. For example, Midwest Real Estate Data ("MRED") is an MLS that covers the Chicago Metro Area and is NAR-associated, requiring NAR membership for access. A substantial number of MLSs, including most large regional MLSs, require NAR membership for access to listings.

7.      To be a member of NAR, real estate brokerage firms such as Defendants must adhere to NAR's regulations and guidelines, including those which apply to broker commissions.

8.      Defendants are heavily intertwined with NAR, which is headquartered in Chicago. NAR frequently names brokers from large residential real estate firms such as Defendants and

_____

[2] See DOJ Backgrounder Q&A: National Association of REALTORS®, available at: https://www.justice.gov/opa/press-release/file/1338606/download#:~:text=NAR's%20Commission%2DConcealment%20Rules%20recomm end,commission%20offered%20to%20buyer%20brokers.

their co-conspirators to serve in leadership positions concurrently with their position as real estate brokers.

9.    For instance, Side executive Casey McLoed served as the 2023 REALTOR® Party of California Chair for C.A.R., held positions on NAR's Legislative and Federal Committees, and is both a REALTORS Political Action Committee (RPAC) Fundraising Trustee and Hall of Fame member.[5] Additionally, Side's Co-Founders, Guy Gal and Hilary Saunders, are NAR members and are ranked 29th overall on the Swanepoel Power 200 list of the most powerful and influential executives in residential real estate, further evidencing Side's entrenched power and reach within the brokerage industry.[6]

10.    The Keyes Company/Illustrated Properties also maintains deep ties to the NAR. Erik Sain, District Sales Manager for The Keyes Company, served as the NAR's VP of Association Affairs. Executives Christina and Michael Pappas have both served as NAR Directors and are consistently ranked on the Swanepoel Power 200 list of the most powerful figures in residential real estate.[8] Christina Pappas currently serves as NAR's 2024 First Vice President and chairs its 75-member Culture Transformation Commission, which meets in Chicago to recommend internal reforms.

11.    Engel & Volkers's Paul Benson & Anthony Hitt have also appeared on the Swanepoel Power 200 list of the "most powerful and influential executives in the residential real

---

[5] Side, *Casey McLoed*, https://www.side.com/team/casey-mcloed/).

[6] Real Estate Almanac, Guy Gal & Hilary Saunders, https://web.archive.org/web/20250118044726/https://www.realestatealmanac.com/executives/guy-gal-hilary-saunders/.

[8] Real Estate Almanac, *Mike Pappas & Christina Pappas*, https://web.archive.org/web/20250409075940/https://www.realestatealmanac.com/executives/mike-pappas-christina-pappas/ (listing Mike Pappas and Christina Pappas, CEO and President of The Keyes Company & Illustrated Properties, respectively, as jointly ranked 80th on the 2025 *Swanepoel Power 200* list of the most powerful executives in real estate).

estate brokerage industry."[10] Additionally, Engel & Volkers Americas Inc.'s current CEO Stuart Siegel was included on the Swanepoel Power 200 Watchlist, which highlights individuals "poised to make the SP 200 ranking in the coming years,"[11] underscoring Engel & Volkers already significant influence and market power within the residential real estate brokerage industry.

12.     Together with other NAR members, these individuals guide NAR's strategic direction and policymaking in such areas as legislation, professional standards, and business services—influencing the NAR rules that apply to their industry. Defendants and other NAR members use this power to benefit themselves at the expense of consumers.

13.     The NAR has promulgated anti-competitive regulations related to broker commissions that include mandatory (i.e. non-negotiable) up-front allocation of a specific portion of the home sale price toward buyer-agent commissions (the "Mandatory Commission Rule").[12] As explained in greater detail below, this rule eliminated competition between buyer-agents with respect to their commission rate and the quality of their services. This lack of competition led to homebuyers paying inflated commission rates and receiving lower quality services. In effect, the Mandatory Commission Rule overcompensates buyer-agents at the homebuyers' expense.

14.     Moreover, during the relevant time period, the NAR and their co-conspirators such as Defendants exacerbated the anti-competitive effect of the Mandatory Commission Rule through

---

[10] Real Estate Almanac, *Paul Benson,*
https://web.archive.org/web/20241103031438/https://www.realestatealmanac.com/executives/paul-benson/.

[11] Real Estate Almanac, *Stuart Siegel*,
https://web.archive.org/web/20250409045728/https://www.realestatealmanac.com/executives/stuart-siegel/.

[12] *2023 Handbook on Multiple Listing Policy*, National Association of Realtors®, at 41, MLS Policy Statement 7.31, https://cdn.nar.realtor/sites/default/files/documents/pdf_mls_handbook-2023-08-11.pdf?_gl=1*6co9sx*_gcl_au*ODk0MjQ3MzYxLjE3MDE2NjYyNjQ (hereinafter "NAR MLS Handbook 2023") (last visited Apr. 10, 2025).

other rules which prohibited buyer-agents from making purchase offers contingent upon a reduction of the buyer-agent's commission ("Non-Modification Rules")[13] and prohibiting the disclosure to buyers of the commission to be paid to buyer-agents ("Commission Concealment Rule").[14]

15.     The result is that the amounts of buyer-agents' commissions became artificially elevated, and this fact was opaque and ill-understood by the homebuyers whose home purchases funded those commissions.

16.     These anti-competitive rules have permitted Defendants and their co-conspirators to sustain buyer-agent fees at artificially high levels which would not exist in a competitive marketplace.

17.     Defendants and their co-conspirators further protected and promoted their conspiracy by exerting control over and manipulating the MLSs, which act as the gateway to homebuying and selling. As set forth above, NAR offers its members access to NAR MLSs that are widely used to facilitate homebuying and selling.

18.     During the time period relevant to this matter, NAR MLSs permitted buyer-agents to filter searches for properties by commission amount, and NAR ethics rules allowed buyer-agents to show these filtered properties with higher commissions to buyers ("MLS Manipulation Practices").[15] Naturally, this conflict of interest led to buyer-agents promoting properties that would maximize their commission, which lowered demand for properties that offered lower

---

[13] Code of Ethics and Arbitration Manual 2023, National Association of REALTORS®, at Standard of Practice 16-16 available at: https://cdn.nar.realtor/sites/default/files/documents/2023-coe-standards-of-practice-2022-12-28.pdf (hereinafter "NAR Code of Ethics 2023")
[14] NAR MLS Handbook 2023 at p. 40, Policy Statement 7.23
[15] 2018 Handbook on Multiple Listing Policy, National Association of REALTORS®, at p. 23 Policy Statement 7.58; P. 81 Section 18.2.4 available at:
https://www.nar.realtor/sites/default/files/documents/2018-HMLP-v1.pdf (hereinafter "NAR MLS Handbook 2018").

commissions and thus eliminated competition from discount brokers. This harmed homebuyers, who received diminished, biased services from buyer-agents who steered homebuyers toward purchasing homes that offered high commissions.

19.     Defendants and their co-conspirators also protected and promoted their conspiracy by exerting control over and manipulating the homebuying experience. During the relevant time period, the NAR ethics code permitted and encouraged buyer-agents to advertise their services as "free," despite the fact that buyer-agents are in fact paid a commission from the sale price of the home that the buyer pays.[16] Current NAR regulations also limit physical access to houses for sale to only NAR members, further reducing competition from unaffiliated brokers.[17]

20.     This anti-competitive behavior has led to buyers paying higher amounts for misrepresented "free" broker services, overpaying for properties (whose purchase price necessarily includes the inflated commissions that cannot be reduced), and receiving overpriced and biased broker services. This collusion, which extended from the very gateway to homebuying (the MLSs) and throughout the homebuying process, also prevented potential competitors who would compete as to the price of broker services.

21.     These rules and practices, adopted and enforced by Defendants and their co-conspirators, constitute agreements among real estate brokers who would have otherwise been competing. Defendants' implementation of these agreements is clearly anti-competitive, an unreasonable restraint on trade, and benefitted only Defendants and their co-conspirators.

22.     Since late 2020, when the Department of Justice sued NAR for antitrust violations, NAR and its members have begun walking back from certain anti-competitive rules discussed

---

[16] Code of Ethics and Arbitration Manual 2018, National Association of REALTORS®, at p. 10 Standard of Practice 12-2, available at: https://www.nar.realtor/sites/default/files/documents/2018-CEAM-v1.pdf (hereinafter "NAR Code of Ethics 2018")
[17] NAR MLS Handbook 2023, at p. 41 MLS Policy Statement 7.31.

herein. However, the harms caused to American homebuyers for decades have not been remedied, nor have the billions in ill-gotten commissions been disgorged. During the relevant time period and prior to the NAR's rules and policies receiving challenges however, the rules, regulations, and practices that furthered the conspiracy remained materially consistent.

23.     Defendants wield significant market power, as each is among the largest real estate brokerages by sales volume in the United States. For instance Defendant Side had $28,870,000,000 in sales volume in 2024 and was ranked as the 9th largest brokerage in terms of sales volume nationally.[19] Defendant Keyes had over $6,800,000,000 in total sales volume in 2024 and was the 26th largest brokerage in terms of sales volume nationally.

24.     Defendants' market power means that their involvement was crucial to the success of the conspiracy with NAR and other brokers. To this end, Defendants consented to engage in, facilitate, and execute the conspiracy, playing a significant role within NAR and mandating that their affiliates comply with NAR's anti-competitive rules and policies as a prerequisite for accessing the benefits of Defendants' brands and infrastructure, including access to MLSs. Defendants, together with their co-conspirators, dominate the market for real estate brokerage services.

25.     Defendants' and their co-conspirators' advancement of the conspiracy has markedly diminished competitive practices in the buyer-agent service sector, negatively impacting homebuyers. This conspiracy empowered Defendants and their co-conspirators to elevate and

---

[19] RealTrends, *Brokerage Profile: Side (San Francisco, CA)*, https://web.archive.org/web/20250409090408/https://www.realtrends.com/brokerage-profile/side-san-francisco-ca/ (archived Apr. 9, 2025); *see also SIDE CEO Guy Gal and Chief Broker Officer Hilary Saunders named Inman Power Players, recognizing the most influential and innovative leaders in real estate*, https://www.linkedin.com/posts/siderealestate_siderealestate-sidecommunity-realtor-activity-7292195837797941248-dQwA (last visited Apr. 10, 2025) (highlighting Side's executive leadership as nationally recognized influencers in the real estate industry).

stabilize buyer-agent fees at levels that were unnaturally high compared to those supported by a competitive market, thus harming homebuyers. Among other anti-competitive effects, the conspiracy allowed brokers to favor properties that offer higher commissions by overlooking or concealing lower commission options that might better suit the buyers' requirements.

26.     The result of the conspiracy has been inflated buyer-agent commissions, higher average cost of homes, and lower quality services provided to homebuyers as a result of buyer-agents who are incentivized to avoid lower commission properties and receive supracompetitive commissions regardless of their experience or the level of services they provide.

27.     Plaintiff and the other Class and Subclass members (as defined below) have suffered significant monetary damages, each incurring hundreds if not thousands of dollars in excess commissions, due to Defendants' participation and involvement in the conspiracy.

28.     Defendants' and their co-conspirators' participation in the conspiracy has unreasonably restrained trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the Illinois Antitrust Act (740 ILCS 10/1 *et seq.*), the Illinois Consumer Fraud and Deceptive Business Practices Act, and the common law. Accordingly, Plaintiff, individually and on behalf of the Class and Subclass members, brings suit against the Defendants and their co-conspirators for these violations, seeking treble damages, injunctive relief, and reasonable attorneys' fees.

**PARTIES**

**A.     Plaintiff**

29.     Plaintiff, Aleandro Lopez, is a resident and citizen of Illinois. In or about December 2021, Plaintiff purchased a property in Bolingbrook, Illinois through a transaction involving a buyer-agent and seller-agent who were both NAR Realtors that worked for brokerages that are members of the NAR. As part of the transaction, Plaintiff paid elevated commissions incorporated

into the purchase price of the home. The property Plaintiff purchased was listed on the MRED MLS, which on information and belief is run by associations with boards of directors comprised of NAR members who must adhere to NAR's guidelines and policies.

## B. Defendants

30. Defendant Engel & Volkers is a global real estate brokerage specializing in premium residential properties, with its corporate headquarters located in Hamburg, Germany. Its U.S. affiliate, Engel & Volkers Americas, Inc., is incorporated in Delaware and maintains its principal place of business in New York. Engel & Volkers conducts business in Illinois through at least two franchises, Live & Play, LLC d/b/a Engel & Voelkers Chicago and Jennifer Ames Chicago, Inc. d/b/a Ames Group Chicago, both of which are licensed to conduct business within the state of Illinois and have operated within this District since 2019 subject to Engel & Volkers' supervision and control.[24]

31. Defendant Side is a real estate brokerage platform headquartered in California and incorporated in Delaware. Side partners with agents and brokers to launch and support real estate companies and has helped establish over 500 such brokerages. In 2024, Side reported $28.87 billion in sales volume, ranking as the 9th largest brokerage in the United States. Side is registered to do business in Illinois and maintains a presence in the state, including by attending real estate industry conferences in Chicago and conducting business with Illinois residents.[25]

---

[24] *Franchise Disclosure Document*, Engel & Völkers Americas, Inc. (2020), at I-11, 11, https://www.franchimp.com/?f=103146_2020.pdf&page=pdf&utm (identifying Jennifer Ames Chicago, Inc., located at 2401 N Clark Street, Chicago, Illinois 60614, as an Illinois-based Engel & Völkers franchisee, and stating that Donald Brown II, Vice President of Engel & Völkers Americas, Inc., resides and works in Bethalto, Illinois).

[25] Side, *Events – Chicago*, https://web.archive.org/web/20250409033838/https%3A%2F%2Fwww.side.com%2Fevents%3Fs%3Dchicago%2B (archived Apr. 9, 2025) (noting Side's attendance at the AREAA National Conference in Chicago on October 12, 2023).

32.     The Keyes Company is incorporated in Florida and headquartered in Miami, Florida. Keyes is one of the largest independent brokerages with over 3,000 realtors and over 50 offices.

33.     Defendant Illustrated Properties, LLC is incorporated in Florida and headquartered in Miami, Florida. A luxury brand within The Keyes Company, Illustrated Properties is a leader among brokerages in South Florida.[26]

**C.     Defendants' Co-Conspirators**

34.     Although not named as party defendants in this action, numerous other entities, such as the NAR, NAR MLSs, and NAR-affiliated brokerages and realtor associations, participated as co-conspirators in the violations alleged herein and performed acts in furtherance thereof.

35.     Specifically, each of the local realtor associations that own and operate NAR MLSs agreed to, complied with, and implemented the Mandatory Commission Rule, which requires a seller-broker to specify the blanket, unilateral commission to be paid to the buyer-agent upon sale in terms of a definite dollar amount or percentage of the sale price. NAR MLSs, among others, have participated as co-conspirators in the violations alleged herein and performed acts in furtherance thereof, including by adopting the Mandatory Commission Rule in their individual rules and regulations.

36.     Other NAR member residential real estate brokerages also participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance

---

[26] *The Keyes Company and Illustrated Properties Join Forbes Global Properties, Establishing Foothold in Florida's Luxury Markets*, FORBES GLOBAL PROPERTIES (Jan. 9, 2024), https://www.forbesglobalproperties.com/trends/the-keyes-company-and-illustrated-propertiesjoin-forbes-global-properties-establishing-foothold-in-floridas-luxury-markets.

thereof. Specifically, each complied with and implemented the Mandatory Commission Rule in the geographic areas where they operate.

37. Defendants are jointly and severally liable for the acts of their co-conspirators, whether named or not named as party defendants in this action.

## JURISDICTION AND VENUE

38. The Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise in part under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

39. This Court also has subject matter jurisdiction over this case and the claims at issue pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this case is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; there are greater than 100 putative class members; on information and belief, at least one putative class member is a citizen of a state other than any of Defendants' states of citizenship; and none of the exceptions under subsection 1332(d) apply to this action.

40. This Court has personal jurisdiction over the Defendants, because each of the Defendants transacts business in this state and this District; each of the Defendants has, through their officers, agents, and employees, transacted with members of the Class and Subclass in this District; and each of the Defendants has, through their officers, agents, and employees, committed substantial acts in furtherance of the unlawful conspiracy among Defendants and their co-conspirators in this District.

41. Moreover, the NAR, which is the conduit by which the conspiracy was adopted and enforced, is headquartered in this District.

42.    Defendants and their co-conspirators participated in, followed, implemented, facilitated, and enforced the conspiracy emanating from this District in at least four ways:  (1) Defendants' and their co-conspirators' brokers and leadership attend NAR meetings, provide input on NAR's operations, and review, lobby for, and vote on NAR rules; (2) Defendants and their co-conspirators assist in NAR's enforcement of the rules; (3) Defendants and their co-conspirators required their brokers and agents to comply with NAR rules, including the Mandatory Commission Rule; and (4) Defendants and their co-conspirators, through their participation in NAR MLSs and their officers' and employees' membership in NAR, agreed to adhere to anticompetitive restraints, including those reflected in MLS rules and NAR's Code of Ethics. Indeed, Defendants and their co-conspirators specifically implemented, complied with, and enforced the Mandatory Commission Rule to their own benefit through the positions their agents hold within NAR and various other NAR organizations that operate nationally from within Illinois.

43.    Defendants and their co-conspirators further participated in and aided NAR in promulgating and codifying other anti-competitive practices that governed and applied to real estate transactions in Illinois. Defendants and their co-conspirators did so through their agents, officers, and employees, some of whom hold leadership positions within NAR or NAR-affiliated organizations.

44.    From within Illinois and this District, NAR leadership drafts, reviews, and publishes regularly updated policies, including its Handbook on Multiple Listing Policy and Code of Ethics. Included in these policies that Defendants and their co-conspirators follow is the anticompetitive Mandatory Commission Rule. Upon information and belief, NAR leadership actively monitored and policed Defendants and their co-conspirators from this District to ensure

full compliance with its rules. Failure to comply with NAR rules can result in loss of membership, expulsion of the entity or individual from MLSs, and other measures.

45. NAR collects substantial revenues and fees from its nationwide membership—including Defendants and their co-conspirators—to fund its operations in this District. Public estimates suggest that NAR makes more than $200 million in revenue every year, with most of that coming from member dues, including from members like Defendants their co-conspirators.

46. Venue is proper in this District under 28 U.S.C. §1391 because Defendants transact business, are found, have agents, and/or reside in this District; a substantial part of the events giving rise to Plaintiff's and the putative class members' claims occurred in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out both in and from within this District.

## COMMON FACTUAL ALLEGATIONS

### A. Broker Compensation in Real Estate Transactions is Opaque for Buyers.

47. Real estate transactions are difficult to navigate for ordinary consumers, and most homebuyers and sellers depend on brokers to assist them with the process. Indeed, a NAR survey in 2023, found that nearly 90% of home sales involved a broker.

48. State laws control who can represent sellers and buyers in real estate transactions. There are two types of licenses: (1) for real estate brokers (or brokerage firms such as Defendants), and (2) for individual agents (such as Defendants' employees). Only licensed brokers can legally be paid for representing buyers or sellers in real estate deals, according to state law. So, all real estate contracts and payments are made to brokers, not agents. Brokers then pay their agents and are legally responsible for their agents' actions.

49.     For the vast majority of residential real estate transactions, brokers and agents on the buy and sell sides are paid based on a percentage of the property's sale price. A typical home sale begins with a homeowner (seller) entering into a contract with a seller-broker whereby the seller will receive a commission equal to 6% of the property's sale price for facilitating the sale of the home. When the seller-broker lists the house on the MLS, they typically make a unilateral offer of 3% commission to any buyer-agent that can bring a buyer to the table to complete the sale.

50.     When the house is purchased, the buyer pays the purchase price into an escrow account where it is then paid to the seller, less the commissions, which are paid to the seller-broker and the buyer-broker.

51.     Because the escrow company distributes the commission, buyers often don't realize that they're effectively bearing the cost of commissions. Moreover, during the relevant time period, as part of the conspiracy alleged herein, NAR's Code of Ethics encouraged buyer-agents to represent that their services are "free."[27] In reality, however, buyers pay for these "free" services through higher purchase prices and elevated commission rates.

**B.     Home Buying in America Runs Through NAR and its Conspirators Like Defendants, Who Dominate the MLSs.**

52.     According to its website, NAR is the largest trade group in the U.S.[28] It includes over 1.5 million members including real estate agents, brokers, managers, and appraisers. Being a NAR member carries benefits like insurance, access to property listings on preferred MLSs, training, and more.

53.     NAR promulgates and enforces rules and policies that its members follow in real estate transactions. On a yearly basis, NAR issues its Handbook on Multiple Listing Policy which

---

[27] NAR Code of Ethics 2018, at p. 10 Standard of Practice 12-2.
[28] https://www.nar.realtor/

requires, *inter alia,* that member brokerages and MLSs align their policies with those set by NAR's board of directors. Brokerages and MLSs abide by these rules, and real estate agents must likewise obey them.

54.     The NAR Board of Directors, and the Multiple Listing Issues and Policies Committee reporting to it, periodically determine whether to modify any policies in the Handbook on Multiple Listing Policy (for example, certain changes to MLS policies were approved by the Board of Directors and made in 2021). The policies that are retained (and any modifications thereto) are set forth in new editions of the Handbook on Multiple Listing Policy that are issued on or about an annual basis. The Board of Directors, and the Handbook on Multiple Listing Policy, have consistently and repeatedly retained the Mandatory Commission Rule.

55.     In setting forth the MLS terms, NAR has successfully invited Defendants and their co-conspirators to participate in the following agreement, combination and conspiracy: They can participate in the MLS, and gain the benefits provided by NAR and the MLS, but only if they agree to follow and enforce the anticompetitive restraints set forth in the Handbook on Multiple Listing Policy.

56.     Both the supply and demand side of the residential real estate market rely on MLSs. Buyer-agents use MLSs to find real estate listing information. And if a seller's broker doesn't list a property on an MLS, many buyer-agents will not show it to their clients.

57.     Numerous additional entities, including NAR-affiliated MLSs, real estate brokerages, and local realtor associations, although not listed as defendants in this case, have actively engaged with Defendants and the NAR as co-conspirators. In particular, each of the local realtor associations responsible for owning and managing NAR MLSs consented to, adhered to, and executed the "Mandatory Commission Rule." This rule mandated that a seller-broker must

define a fixed, unilateral commission for the buyer-broker, which would be disbursed upon the sale of the property, either as a specific dollar value or as a percentage of the sale price.

58.     Defendants each adopted the Mandatory Commission Rule within their respective rules and regulations and specifically implemented, complied with, and enforced the Mandatory Commission Rule for transactions involving their agents in Illinois during the relevant time period.

59.     For example, Engel & Volkers requires that its franchisees adhere to the Code of Ethics and Standards of Practice of the NAR. Specifically, Engel & Volkers mandates that franchisees and their agents "conform to any Code of Ethics or similar standard of conduct promulgated by any REALTOR® association to which Licensee or its employees or Sales Advisors belong, such as the Code of Ethics and Standards of Practice of the National Association of REALTORS®." Engel & Volkers also conditions franchisee compliance on MLS membership, and thus NAR membership, stating that failure to "obtain or maintain membership in the Multiple Listing Service if such is available in your Protected Area" is grounds for termination of the agreement

60.     In addition, Defendants also aided the NAR in promulgating and codifying the other anti-competitive practices discussed herein, including the Mandatory Commission Rule, through the positions their brokers hold within NAR and various other NAR committees and organizations that operate nationally and from within Illinois.

61.     Defendants are thus liable for the acts of their co-conspirators, whether named or not named as defendants in this Complaint.

62.     Defendants and their co-conspirators have significant market power. They collectively control the primary MLSs and have a major share of many local and national markets. Defendants, along with their affiliates and co-conspirators, provide a significant portion of the

residential real estate broker services in Illinois. And Defendants are each among the largest brokerages in terms of sales volume. As such, Defendants and their co-conspirators dominate the buyer-agent services market.

63.     The relevant geographic market is the set of regions in which MLSs in which Defendants participate are active. This market includes the market for services provided to homebuyers by residential real estate brokers with access to MLSs like MRED.

64.     Through NAR and its associated organizations, Defendants worked in concert with their co-conspirators—such as other brokerages and MLSs like MRED—to implement and enforce the anticompetitive rules and policies that kept agent commissions elevated. Defendants and their co-conspirators, by controlling the MLSs, enforced the Mandatory Commission Rule and other anti-competitive NAR rules for transactions with Class members, Subclass members, and other market participants.

65.     For example, Michael Pappas, President and CEO of The Keyes Company and Illustrated Properties, has also been a member of NAR's Real Estate Services (RES) program which "works closely with large firm representatives to better understand their business interests and to identify how NAR can bring them tangible value. Through RES, diverse real estate services firms are given an avenue to provide meaningful input to NAR[.]" Members of the RES Advisory Group have seats on NAR's Executive Committee and on its Board of Directors.

66.     Access to MLSs is vital for brokers to compete and work with homebuyers in those areas. Buyer-brokers operating in regions covered by the primary MLSs would face overwhelming obstacles if they tried to compete outside of the MLSs. Due to Defendants' and their co-conspirators' dominance over the MLSs, brokers not involved in the conspiracy would have to create a new listing service to rival the conspirators or try to compete without one. Seller-brokers

not using an MLS would miss out on most potential buyers, while buyer-agents not using an MLS would miss out on most sellers. Essentially, without access to a listing service, brokers cannot compete effectively.

67. To effectively rival a NAR MLS, any new listing service must offer as extensive a range of listings. Brokers and their agents, who benefit from high buyer-agent commissions, have little reason to join a new service that could lead to increased competition and reduced commissions. Moreover, many buyers would hesitate to hire agents from such a service, especially since buyer agents on NAR MLSs claimed their services were free to buyers and fully paid by sellers during most of the relevant time period. Consequently, brokers on alternative services would find it hard to attract agents and their clients. Also, buyer-agents would be wary of using a service with fewer property options. Hence, a listing service trying to compete with a NAR MLS would likely struggle to gather enough listings to be profitable and challenge the established MLSs. The current lack of competitive listing services indicates significant entry barriers.

68. To further limit competitive pricing pressure, NAR recommends that MLSs include non-compete clauses as a vital part of their agreements with third-party listing websites like Zillow seeking MLS data access. According to NAR's list of "critical components," such non-compete agreements should ensure that the third-party website agrees not to rival brokerage firms like Defendants or MLSs by either turning into a licensed brokerage or offering cooperation and compensation deals. NAR also recommends that these agreements should prevent the third-party website from using the data in ways that mirror the functions of an MLS. Therefore, as part of the conspiracy, NAR advises MLSs to actively work to stop third-party websites from emerging as competitors.

**C.**     **Defendants and Their Co-Conspirators Have Adhered to NAR's Anti-competitive Rules, Regulations, and Standards of Practice.**

69.     NAR and Defendants suppressed competition in a number of ways, primarily through requiring buyer-agents and seller-brokers to conform to NAR's regulations as a condition of membership. NAR's Handbook, Code of Ethics, and Standards of Practice enforce various rules, policies, and practices on all co-conspirators, including NAR MLSs and Defendants.

70.     As NAR's Code of Ethics specified during the relevant time period: "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."[30]

71.     Moreover, the NAR's Handbook on Multiple Listing Policy stipulates that association and association-owned MLSs must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program.[31]

72.     NAR empowers its MLSs to fine, suspend, and revoke the membership of MLS users that do not comply with NAR regulations. Given the commercial necessity of access to the NAR MLSs, brokers and agents are compelled to adhere to these mandatory provisions. Without access to local MLSs, a broker or agent would be incapable of listing or viewing properties for sale in the centralized database.

73.     To ensure that its rules are being followed, NAR also conducts examinations of the governing documents of its local realtor associations to verify their adherence to its rules. Further,

---

[30] NAR Code of Ethics 2018, at p. 241 Section 2.
[31] NAR MLS Handbook 2018 at p. 161; NAR MLS Handbook 2023, at p. 169.

NAR obligates its local realtor associations to prove their compliance with these rules by periodically submitting their governing documents to NAR for evaluation.

74.     NAR offers many benefits to its realtor associations and the MLSs they own, including professional liability insurance. To qualify for this insurance, however, realtor associations and their MLSs must adhere to the mandatory provisions in the Handbook on Multiple Listing Policy. NAR withholds these insurance benefits from realtor associations and MLSs that fail to comply with its mandatory provisions. Indeed, NAR's Handbook currently reads: "[t]hose associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation."[32]

75.     During the relevant time period, NAR's rules and policies have included numerous collusive and anti-competitive requirements: (i) the Mandatory Commission Rule; (ii) rules preventing the disclosure to buyers of the total broker commissions in a home sale ("Commission Concealment Rules"); (iii) policies limiting the ability of sellers and seller-brokers to change the commissions offered to buyer-agents after a purchase offer is made ("Non-Modification Rules"); (iv) policies that allow and encourage buyer-agents to inform homebuyers that their services come at no cost ("Free-Service Rule"); (v) guidelines enabling buyer-agents to filter MLS listings based on commission levels ("MLS Manipulation Practices"); and (vi) a policy restricting access to key-holding lockboxes to NAR members only ("Lockbox Policy").[33]

---

[32] NAR MLS Handbook 2023, at p. 8 Policy Statement 7.17
[33] Numerous of these anti-competitive rules were implicated in the DOJ's investigation of NAR. https://www.justice.gov/opa/press-release/file/1338606/download#:~:text=NAR's%20Commission%2DConcealment%20Rules%20recommend,commission%20offered%20to%20buyer%20brokers.

76.     NAR and its members maintain a defined arrangement: Members can join the MLS and receive benefits from NAR and NAR MLSs, but only if they commit to follow and implement the anti-competitive restraints outlined in NAR's rules, practices, and policies. As a result, the implementation and enforcement of these guidelines by NAR and NAR MLSs constitute coordinated actions among parallel competitors, forming agreements among (should-be) rival real estate brokers. These agreements diminish price competition among brokers, resulting in increased costs and lesser service quality for American homebuyers.

77.     Defendants have played a pivotal role in the conspiracy described above by, among other things: placing their brokers in leadership positions within NAR and local NAR associations; mandating that their employees, franchisees, affiliates, and the agents working under them adhere to NAR rules, including the anti-competitive rules listed above; and exerting influence over local realtor associations by, for instance, requiring adoption of NAR's rules, such as the Mandatory Commission Rule.

78.     Defendants' rules and policies generally require their affiliates and agents to: (1) adhere to NAR's Code of Ethics; (2) become members of and follow local realtor association rules; and (3) participate in and comply with the rules of the local MLS, which include the mandatory provisions of NAR's Handbook on Multiple Listing Policy.

**D.     The Mandatory Commission Rule, Commission Concealment Rule, and Anti-Modification Rule are Unreasonable Restraints on Trade.**

79.     During the relevant time period, the Mandatory Commission Rule read: "In filing a property with the multiple listing service of an association of REALTORS®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and

shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants."[34]

80.     The Mandatory Commission Rule has further stated throughout the relevant time period that: "multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."[35]

81.     This practice has been widely, if not universally, adopted. Indeed, nearly every MLS in the U.S. required listing brokers to extend a blanket offer of compensation to buyer-agents during the relevant time period.

82.     The Mandatory Commission Rule prevented buyer-agents from competing on terms such as price and service quality. Therefore, the Mandatory Commission Rule curtailed competition in the market for buyer-agent services, adversely affecting homebuyers in various ways.

83.     Moreover, because the Mandatory Commission Rule required brokers to provide blanket, unilateral, unconditional offers of commissions, brokers had little incentive to compete in terms of service quality to earn higher commissions. For instance, new brokers who had only recently obtained their licenses could charge the same rates as seasoned, highly skilled brokers. Similarly, when broker commissions are based on a percentage of the gross selling price, a buyer-agent assisting in an $800,000 home purchase could earn potentially double compared to one assisting in a $400,000 home purchase, irrespective of whether the higher compensation matches the level and nature of services rendered.

---

[34] NAR MLS Handbook 2018, at p. 65 Section 5; NAR MLS Handbook 2023, at p. 69 Section 5.
[35] NAR MLS Handbook 2018, at p. 35 Section 5; NAR MLS Handbook 2023, at p. 40 Section 5.

84. This practice has drawn the ire of consumer watchdog organizations. Indeed, the Consumer Federation has called brokers "a price-setting cartel." As the Federation explained, "[i]n a rational pricing system, home sellers and buyers would each pay for real estate brokerage services they receive."[36] But, "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform [] commissions would quickly disappear."[37]

85. The Mandatory Commission Rule lacks any pro-competitive rationale. Before the early 1990s, all brokers either represented sellers or were subagents of those representing sellers. Under this almost universal sub agency system brokers, even those working solely with buyers were legally obligated to represent the interests of sellers. Because nearly all brokers involved in transactions represented the seller either as the seller's agent or as the subagent of the listing (i.e., seller's) broker, the seller's broker, who received payment from the seller, would then remunerate the subagent assisting the buyer.

86. But with the advent of brokers representing buyers directly, payment of buyer-agents' commissions from a fixed total commission split between brokers is no longer justified. Real estate industry insiders have conceded that the practice of seller-brokers dictating the fees that buyer-agents charge to their own clients should be recognized as potentially fixing market prices. There is no pro-competitive justification for allowing seller-brokers to determine the default commissions charged by competing buyer-agents to their clients. Rather, removing inter-broker compensation would reduce brokers' ability to impede price competition, likely resulting in a

---

[36] Testimony of Stephen Brobeck, *Residential Real Estate Brokerage Services: a Cockamamie System that Restricts Competition and Consumer Choice*, CONSUMER FED'N OF AM., at 3-4 (July 25, 2006), available at https://consumerfed.org/wp-content/uploads/2006/07/7-25-06-Residential-Real-Estate-Brokerage_Testimony.pdf.

[37] Stephen Brobeck and Patrick Woodall, *How the Real Estate Cartel Harms Consumers and How Consumers Can Protect Themselves*, CONSUMER FED'N OF AM., at 4 (June 2006), available at https://consumerfed.org/pdfs/Real_Estate_Cartel_Study061906.pdf.

significant decrease in broker commissions.

87. The reason for the Mandatory Commission Rule is clear: to maintain high broker commissions for Defendants, other NAR members, and their co-conspirators at the expense of homebuyers. In the absence of the Rule, buyers rather than sellers would negotiate buyer-agent commissions, and brokers would compete with one another by offering lower commission rates and/or higher quality services.

88. The Commission Concealment Rules protected the Mandatory Commission Rule and exacerbated its anti-competitive effects. These rules barred disclosure of the offered buyer-agent commission to potential buyers.

89. The Commission Concealment Rules were laid out in several places in NAR's Handbook during the relevant time period, including Policy Statement 7.23, which stated: "the multiple listing service shall not publish the total negotiated commission on a listing which has been submitted to the MLS by a participant. The multiple listing service shall not disclose in any way the total commission negotiated between the seller and the listing broker."[38]

90. Hence, while buyer-agents were aware of the commission they'd receive if their client bought a property, NAR MLSs kept this fee hidden from the homebuyers who ultimately paid the commission through the property's purchase price.

91. At the same time, NAR rules required brokers to share pricing information among themselves. This kind of unilateral information sharing agreement is collusive and further diminished the incentive for buyer-agents to compete on pricing, whether by offering rebates or accepting reduced commissions. It also promoted and facilitated the setting of consistently high

---

[38] NAR MLS Handbook 2018, at p. 34 Section 1 Policy Statement 7.23; NAR MLS Handbook 2023, at p. 40 Section 1 Policy Statement 7.23

commission rates by brokers, leading to increased costs for buyer-agent services. Moreover, because buyers were unable to view commission offers, they were unable to identify when they were being steered towards a property with a high commission. As explained below, this type of steering leads to higher prices and diminishes the quality of services provided by buyer-agents to homebuyers.

92. During the relevant time period, NAR's ethical rules explicitly forbade buyer-agents from attempting to decrease the buyer-agent commissions listed on MLSs when submitting purchase offers ("Non-Modification Rules"). Therefore, even if a homebuyer had been able to access sufficient information to negotiate a reduced buyer-agent commission, NAR's rules wouldn't have allowed such negotiations. Although NAR frequently claimed in litigation that brokers could purportedly negotiate their fees at any point in the transaction, NAR's Standard of Practice 16-16 stated during the relevant time period that:

> REALTORS®, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.[39]

93. In other words, a buyer-agent could not even present an offer to a seller that was conditional on the seller reducing the buyer-agent commission without violating the NAR's ethics rules. This did nothing but unreasonably restrain homebuyers' negotiations to the benefit of NAR members such as Defendants.

94. If buyer-agents did try to alter buyer-agent commissions, NAR advised them to initiate these modifications before they even showed the property to prospective buyers. By

---

[39] NAR Code of Ethics 2018, at Standard of Practice 16-16; NAR Code of Ethics 2023, at Standard of Practice 16-16.

obliging buyer-agents who were open to reducing their commissions to seek these reductions before showing the property to a potential buyer, NAR rules effectively shut down most negotiation over the buyer-agent commission. To adhere to this, a buyer-agent would have had to independently approach a seller-broker to negotiate a cut in their own commission, even before their client had viewed the potential home. In practice, this was unlikely to occur because it would require buyer-agents to proactively approach seller-brokers and negotiate commissions where no buyer had yet been identified. As NAR knew, this would be seen by most individuals as a speculative waste of time.

95.    NAR's rules also limited the negotiation of the buyer-agent commission by stipulating that once a seller had received purchase offers, the seller-broker was not allowed to unilaterally alter the buyer-agent commission originally offered on the MLS. This was outlined in NAR Standard of Practice 3-2, which stated during the relevant time period that:

> Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction.[40]

96.    Consistent with NAR's rule, the MRED Rules and Regulations, for example, stated that a listing broker could only offer a buyer-agent compensation that differed from the compensation indicated on the listing if the seller-broker "informs the other broker in writing or in accordance through the Service in advance of his producing an offer to purchase . . . ."[41]

---

[40] NAR Code of Ethics 2018, at Standard of Practice 3-2; NAR Code of Ethics 2023, at Standard of Practice 3-2.
[41] Section 5: Division of Commissions, Rules and Regulations, Midwest Real Estate Data, MRED Quick Reference Guide. (Revised Feb. 2019), https://ww2.mredllc.com/wp-content/uploads/2018/07/MRED-Rules-and-Regulations.pdf.

97.     NAR further restricted negotiation by deeming it unethical for a buyer-agent to suggest that the buyer directly negotiate with the seller to lower commissions. Given that most homebuyers have little to no understanding of this market and are under the impression that the buyer-agent's services are "free," this limitation additionally curbed negotiations concerning buyer-agent commissions.

**E.     The Free-Service Rule and MLS Manipulation Practices Allow Defendants and their Co-Conspirators to Dominate the Homebuying Process and Improperly Steer Homebuyers to Higher-Commission Properties.**

98.     During the relevant time period, Defendants and their brokers also adopted NAR's Free-Service Rule, which encouraged buyer-agents to mislead buyers into thinking that the buyer-agent's services were free when actually they were not.

99.     During the relevant time period, NAR Ethics Standard 12-2 stated "REALTORS® may represent their services as 'free' or without cost even if they expect to receive compensation from a source other than their client provided that the potential for the REALTOR to obtain a benefit from a third party is clearly disclosed at the same time." Because buyer-agents are technically paid out of the home's purchase price, those buyer-agents could misleadingly tell their buyer clients that their services were "free." As a result, homebuyers were led to think they were paying nothing for buyer-agent services, when in reality the buyer-agent's commissions were incorporated into the purchase price of the home.

100.     Because buyers were led to believe that they were not paying for brokerage services, they were not given a meaningful opportunity to negotiate for a lower buyer-agent commission or seek out or discover appealing rebate offers or other discounts from buyer-agents. As such, NAR's Free-Service Rule contributed to elevated costs for services rendered by buyer-agents.

101.    NAR's MLS Manipulation Practices were yet another set of rules that hindered competition and contributed to elevated commissions. During the relevant time period, NAR's MLS Manipulation Practices enabled buyer-agents to curate MLS listings according to the amount of buyer-agent commissions being offered. Additionally, some MLSs even allowed buyer-agents to exclude homes from potential homebuyers when they offered lower commissions, despite meeting the buyer's search requirements.

102.    For instance, during the relevant time period, Policy Statement 7.58 in NAR's Handbook read: "Participants may select the IDX listings they choose to display based only on objective criteria including . . . cooperative compensation offered by listing brokers."[42]

103.    The MLS Manipulation Practices, adopted by Defendants and NAR MLSs during the relevant time period, aided in steering by enabling buyer-agents to selectively hide from potential homebuyers those property listings that provided for lower buyer-agent commissions. This practice, which has since been repealed,[43] diminished the quality of services provided by buyer-agents and increased the cost of these services for homebuyers.

**F.    The Lockbox Policy Shut Out Competitors.**

104.    Further reducing competition for buyer-agent services, NAR and its member brokers also restricted physical access to listed properties through the use of lockboxes that were available only to real estate brokers who were part of a NAR MLS. These brokers, with the consent of the sellers, stored keys to the homes listed for sale in lockboxes, enabling them to grant potential buyers limited access to the properties. Access to these lockboxes was controlled by real estate brokers using either a numerical code or a digital Bluetooth 'key' which was not provided to non-members of NAR.

---

[42] NAR MLS Handbook 2018, at p. 23 Policy Statement 7.58; P. 81 Section 18.2.4.
[43] NAR MLS Handbook 2023, at p. 23 Policy Statement 7.58; P. 87 Section 18.2.4.

105.     During the relevant time period, NAR and NAR MLSs implemented a set of rules (outlined in the NAR Handbook, Policy Statement 7.31) that limited lockbox access solely to real estate brokers who were NAR members that subscribed to the NAR MLS.[44] Brokers not affiliated with NAR were denied access to these lockboxes, preventing them from showing their clients homes listed for sale, which in turn diminished competition in the realm of buyer-broker services.

## G.     The Conspiracy Harmed Homebuyers.

106.     The rules and practices discussed above have collectively functioned to sustain elevated commission rates and deteriorate the quality of services that homebuyers received from buyer-brokers during the relevant time period. These regulations led to increased buyer-broker commissions despite technological advancements and other changes that should have noticeably decreased commissions. Additionally, they considerably hindered the capacity of more cost-effective alternatives to foster a more competitive market.

107.     There is no pro-competitive benefit to the conspiracy. Defendants and their co-conspirators have effectively maintained and significantly raised the financial costs of buyer-broker commissions, despite the diminishing role of buyer-brokers due to the emergence of third-party listing websites. NAR data indicates that many homebuyers now prefer to search for prospective homes independently through online services, rather than with a broker's help, and buyer-brokers are increasingly engaged only after their client has identified the desired home. Yet, despite the reduced involvement of buyer-brokers, buyer-agents still often received the same artificially high commission due to the conspiracy among Defendants and other brokers.

108.     The conspiracy between Defendants and other brokers has had many anti-

---

[44] NAR MLS Handbook 2018, at p. 36 Policy Statement 7.31; NAR MLS Handbook 2023, at p. 41 Policy Statement 7.31.

competitive effects, including:

a. Homebuyers have incurred elevated buyer-broker commissions and total commissions, which were integrated into the purchase price of their homes;

b. Seller-brokers were disinclined to offer commissions below market rate for fear that the seller's house would not be shown;

c. The engagement of a buyer-broker became disconnected from the determination of the broker's commission;

d. There has been a suppression of price competition among brokers for retention by homebuyers;

e. Homebuyers' competitive ability has been hindered due to their inability to compete for home purchases by reducing the buyer-broker commission;

f. The quality of services provided by buyer-brokers has declined, as they are motivated to direct their clients towards homes with higher commissions;

g. The quality of buyer-broker services has further deteriorated due to obstacles that impeded buyer-brokers from presenting and receiving purchase offers that would lower the buyer-broker commission, thereby making these offers more appealing and acceptable to sellers; and

h. Brokers have significantly increased their profits by obtaining inflated buyer-broker commissions and total commissions.

109. Defendants and their co-conspirators have not only maintained but, in terms of inflation-adjusted dollars, significantly increased the fees charged by buyer-brokers, a situation that markedly contrasts with trends in other industries. In almost every consumer sector — including bookselling, retail, home appliances, insurance, banking, and stock brokering — the emergence of technology and the proliferation of internet and discount sellers has tremendously benefited customers financially. Economists refer to this reduction of transaction costs as "disintermediation." The real estate brokerage market, worth approximately $70 billion annually, is particularly suited for such a transformation. Yet, despite the technological advancements that have diminished the role of brokers and the considerable fluctuations in housing market prices,

31

brokerage fees have not adapted to these changes. This resilience, or "stickiness" in commissions is attributable to the collusive conspiracy alleged herein.

110.    There is also a notable discrepancy between buyer-broker costs and the commissions they earn. In a competitive market, pressure from and among competitors forces prices toward the marginal cost of goods (or services) sold. However, this pattern is not evident in real estate brokerage fees. For instance, the costs incurred by buyer-brokers are generally consistent, and have trended downward with technology, irrespective of the home's price. As noted by the Wall Street Journal, "many, if not most, of the services that Realtors provide don't vary with the sales price, so the percentage fee should fall as home price rises." Contrary to this expectation, broker commissions remain disconnected from the amount, quality, and value of the services provided.

111.    Even if there were any plausible pro-competitive effects of Defendants' and their co-conspirators' conspiracy, those effects would be substantially outweighed by the conspiracy's anti-competitive effects.

112.    There is considerable economic evidence that Defendants' and their co-conspirators' conspiracy has inflated buyer-broker commissions and total commissions to well above a competitive level nationwide.

113.    The conspiracy among Defendants and their co-conspirators consistently kept broker commission rates at exceptionally stable and elevated levels over the past two decades. This trend persisted despite the emergence of the internet and the reduced role of buyer-brokers. From 2000 to 2017, the average national commission rate remained consistently high, between 5% and 5.4%, irrespective of varying market conditions.

114.    Housing prices in many areas have risen significantly recently, surpassing the rate

of inflation. Given that commissions are calculated as a percentage of a home's sale price, the real dollar value of commissions has substantially increased alongside the price of homes. "For example, between 2001 and 2017, the average price of new homes in current dollars sold rose from $213,200 to $384,900, according to U.S. Census Bureau Statistics." [45]

115. As the Consumer Federation of America points out: "[b]ecause the industry functions as a cartel, it is able to overcharge consumers tens of billions of dollars a year. . . . Consumers are increasingly wondering why they are often charged more to sell a home than to purchase a new car."[46]

116. During the relevant time period, the typical total broker commissions (i.e., the combined commission for the seller-broker and buyer-broker) in regions with NAR MLSs range from 5% to 6%, markedly higher than in countries with competitive residential real estate brokerage markets. In their 2002 study "International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry," economists Natalya Delcoure and Norm Miller observed: "Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand. . . . In the UK, the [total] commission rates average less than 2%. . . . In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%."[47]

117. Delcoure and Miller also noted variations within countries. For instance, in the

---

[45] *Comments of Stephen Brobeck, Executive Director Consumer Federation of America Before the Department of Justice-Federal Trade Commission Public Workshop on Competition Issues*, CFA, 2 n.4 (June 5, 2018), https://consumerfed.org/wp-content/uploads/2018/06/CFA-comments-DOJ-FTC-publicworkshop-on-competition-issues.pdf.

[46] Glen Justice, *Lobbying to Sell Your House*, N.Y. TIMES (Jan. 12, 2006), https://www.nytimes.com/2006/01/12/business/lobbying-to-sell-your-house.html.

[47] Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 INTL. REAL ESTATE REV. 12, 14 (2002).

United Kingdom, Delcoure and Miller found that "1%-2% is typical; in very competitive areas 0.5- 0.75%; in low priced areas [for homes] as high as 3.5%."[48] Ultimately, they concluded that, "[b]ased on global data . . . [total] US residential brokerage fees should equal something closer to 3.0%."[49] That is approximately <u>half</u> of what such fees are now.

118.    Indeed, economists Chang-Tai Hsieh and Enrico Moretti have proposed that competition could potentially eliminate over half of the current commission rates. [50]

119.    The conspiracy to restrict price competition for commissions has had a significant negative economic impact. The Consumer Federation of America noted, "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform 5-6% commissions would quickly disappear."[51] This suggests that the current uniform commission rates born from NAR rules were maintained by the lack of individual negotiation and competition.

120.    The extent and significance of the overcharges at issue in this case have resulted in a tremendous economic burden for the putative class members and other consumers. Experts have estimated that consumers could save approximately $30 billion or more each year if there were price competition among brokers.[52]

**H.    Due to Defendants' Concealment of the Conspiracy and Plaintiff's Reasonable Lack of Knowledge Thereof, the Statutes of Limitations have Been Tolled.**

121.    In the years leading up to the filing of this Complaint, Defendants and their co-conspirators repeatedly and continuously engaged in anti-competitive behavior. This includes the implementation and enforcement of the Mandatory Commission Rule and other anti-competitive

---

[48] *Id.* at 17.
[49] *Id.* at 29.
[50] *See* Chang-Tai Hsieh & Enrico Moretti, *Can Free Entry be Inefficient? Fixed Commissions and Social Waste in the Real Estate Industry*, 111 J. POL. ECON. 1076, 1116 (2003).
[51] Brobeck & Woodall, *Supra* n.6.
[52] Mark S. Nadel, *A Critical Assessment of the Traditional Residential Real Estate Broker Commission Rate Structure (Abridged)*, 5 CORNELL REAL ESTATE REV. 26, 26 n.1 (2007).

NAR rules.

122.    As a result of their conspiracy with the NAR and other brokerages, Defendants have consistently charged and collected, and continue to charge and collect, excessive buyer-broker commissions and total commissions. Plaintiff and the other Class and Subclass members paid excessive and inflated commissions in connection with their purchase of residential real estate. Every instance of paying these inflated commissions by the Plaintiff and the Class and Subclass members during the class period resulted in harm to them and created a new cause of action.

123.    Plaintiff and the other Class and Subclass members had no knowledge of Defendants' unlawful conspiracy with NAR and their other co-conspirators, nor a full understanding of Defendants' roles in that conspiracy, and could not have discovered it by the exercise of due diligence prior to the filing of this action.

124.    It was reasonable for Plaintiff and the Class and Subclass Members not to suspect Defendants of engaging in illegal anti-competitive conduct. Plaintiff and the members of the Class and Subclass, as typical homebuyers, lack extensive knowledge or insights about the real estate industry and are not familiar with NAR's operations. Further, as explained above, NAR's policies, rules, and practices explicitly forbade revealing the total broker commissions to homebuyers and encouraged buyer-brokers to convey to their clients that they are receiving the brokers' services at no cost. Consequently, the average homebuyer was not made aware that they were incurring costs for buyer-broker services, much less that Defendants are conspiring to uphold excessively high broker commissions.

125.    For these reasons, the statutes of limitation applicable to Plaintiff's and the other Class and Subclass members' claims have been tolled with respect to the claims asserted herein.

126.    Additionally, or alternatively, application of the doctrine of fraudulent concealment

tolled the statutes of limitations applicable to Plaintiff's and the Class and Subclass members' claims.

127.    Defendants actively concealed the conspiracy by, for example, prohibiting the disclosure of total commissions to homebuyers and encouraging brokers to represent to homebuyers that their services were free of charge.

128.    Moreover, Defendants' anti-competitive behavior was intrinsically self-concealing given NAR's strict control over its regulated MLSs, agents, and brokers. A reasonable buyer, under the circumstances, would not have had grounds to suspect exposure to anti-competitive actions. The policy that prevented NAR MLSs from disclosing to prospective buyers the commission a buyer-broker would receive for a home purchase on the MLS naturally hid the conspiracy's existence. Similarly, practices that allowed buyer-agents to falsely claim their services were complimentary to buyers, and actions by the Defendants' agents to filter MLS listings based on buyer-broker commission levels and exclude homes offering lower commissions, were also inherently self-concealing.

## CLASS ALLEGATIONS

129.    Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action both individually and on behalf of a Class (the "Class") and Illinois Subclass (the "Illinois Subclass" or "Subclass") of similarly situated individuals defined as follows:

**Nationwide Class:** All persons who, during the applicable limitations period, purchased residential real estate listed on a NAR MLS in the United States.

**Illinois Subclass:** All persons who, during the applicable limitations period, purchased residential real estate listed on a NAR MLS in the state of Illinois.

130.    Expressly excluded from the Class and Illinois Subclass are any members of the judiciary assigned to preside over this matter and their staff; Plaintiff's counsel and Defendants'

counsel; any officer, director, or employee of Defendants and their affiliates; and any immediate family members of such officers, directors, or employees.

131.    On information and belief, there are at least tens of thousands, if not hundreds of thousands, of members of the Class and Illinois Subclass, making the members of the Class and Illinois Subclass so numerous that joinder of all members is impracticable. Although the exact number of Class and Illinois Subclass members is unknown to Plaintiff, the members can easily be ascertained through Defendants' records.

132.    Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class and Illinois Subclass. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other members of the Class and Illinois Subclass, and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Class and Illinois Subclass.

133.    Plaintiff's claims are typical of the claims of the other members of the Class and Illinois Subclass, in that the factual and legal bases of Defendants' liability to Plaintiff and to the other members of the Class and Illinois Subclass are the same. Plaintiff and the other members of the Class and Illinois Subclass have all suffered similar harms and damages as a result of Defendants' anticompetitive practices and collection of unlawfully excessive commissions.

134.    There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class and Illinois Subclass, and those questions predominate over any questions that may affect individual members of the Class and Illinois Subclass. Common questions for the Class and Illinois Subclass include, but are not limited to:

   a.   Whether Defendants conspired with their co-conspirators as alleged herein;

b. Whether the conspiracy harmed competition as alleged herein;

c. Whether homebuyers were harmed as a result of Defendants' anti-competitive conduct as alleged herein;

d. Whether buyer-agent commissions were elevated as a result of the conspiracy;

e. Whether the quality of buyer-agent services was diminished as a result of the conspiracy;

f. Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

g. Whether Defendants committed deceptive acts under the ICFA by representing to the members of the Illinois Subclass that buyer-agent fees were free, paid by the seller, or otherwise not ultimately paid by the buyer;

h. Whether Defendants should be enjoined from engaging in such conduct in the future;

i. The appropriate class-wide measures of damages; and

j. Whether Defendants should be ordered to disgorge all unlawful fees collected by them or on their behalf during the applicable limitations period.

135. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class and Illinois Subclass is impracticable. This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision making.

136. Absent a class action, most members of the Class and Illinois Subclass would find the cost of litigating their claims to be prohibitive and would have no effective remedy. Unless the Class and Illinois Subclass are certified, Defendants will retain the monies they received from the members of the Class and Subclass as a result of their unfair and deceptive conduct.

## COUNT I
### Violations of Section 1 of the Sherman Act, 15 U.S.C § 1
### (On Behalf of the Plaintiff and the Class Members)

137.    Plaintiff realleges and incorporates by reference each of the foregoing allegations as though stated herein.

138.    During the four years preceding the filing of this action, and beginning years prior, Defendants and/or their co-conspirators engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

139.    The misrepresentations as to the payment of brokerage commissions and the increased prices of houses sold due to elevated broker commissions are actual and proximate causes of harm to homebuyers. The contract, combination, or conspiracy alleged herein has consisted of continuing agreements among Defendants and their co-conspirators to set, raise, and maintain the level of broker commissions.

140.    In furtherance of the contract, combination, or conspiracy, Defendants and their co-conspirators have committed one or more of the following overt acts:

   a.   participated in the establishment, maintenance, and implementation of the Mandatory Commission Rule and other anti-competitive NAR rules;

   b.   participated in the establishment, maintenance, and implementation of rules by NAR associations and MLSs that adopted the Mandatory Commission Rule and other anti-competitive NAR rules; and

   c.   used their control over the NAR MLSs to force affiliated brokers, members, and franchisees to implement and adhere to the Mandatory Commission Rule and other anti-competitive NAR rules in the areas in which the NAR MLSs operate.

141.    Defendants' and their co-conspirators' conspiracy has caused buyer-agents to conceal total commissions, to misrepresent to buyers that buyer-agents' services are free, to steer

homebuyers towards high commission listings, and to diminish the value of buyer-agent services by restraining competition on buyer-agent commission fees in the home buying process. The conspiracy has also had the effect of excluding non-NAR-affiliated brokers from competing in the market for buyer-agent services by restricting access to lockboxes, which is required in order for buyer-agents to show houses for sale to their clients.

142.  Defendants' and their co-conspirators' conspiracy has also reduced competition among buyer-agents, thereby requiring buyers to pay inflated prices for their homes and inflated buyer-agent commissions. Reduced price competition among buyer-agents has also reduced the quality of broker services provided to homebuyers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

143.  Plaintiff and the other Class Members paid inflated home purchase prices and broker commissions throughout the class period in connection with the purchase of residential real estate listed on the NAR MLSs. Absent Defendants' and their co-conspirators' conspiracy, Plaintiff and the other Class members would have paid lower prices for their homes and lower commissions.

144.  Plaintiff and Class members also received diminished services from buyer-agents as a result of the conspiracy. Absent this conspiracy, Plaintiff would have received improved services and had the ability to freely negotiate and reduce the purchase prices of their homes.

145.  As a direct and proximate result of Defendants' and their co-conspirators' past and continuing violations, Plaintiff and the Class members have been injured in their business and property.

146.  Plaintiff and the members of the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein, and to damages as permitted

by law for the injuries they suffered as a result of Defendants' and their co-conspirators' anti-competitive conduct.

147.    Accordingly, with respect to Count I, Plaintiff, individually and on behalf of the proposed Class, prays for the relief set forth below.

**COUNT II**
**Commission-Fixing Conspiracy in Violation of the Illinois Antitrust Act**
**740 ILCS 10/1 *et seq.***
**(On Behalf of Plaintiff and the Illinois Subclass Members)**

148.    Plaintiff realleges and incorporates by reference each of the foregoing allegations as though stated herein.

149.    During the four years preceding the filing of this action, and beginning years prior, Defendants and/or their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Illinois for the purpose and with the effect of fixing, controlling, or maintaining the commissions paid to Defendants' agents. Defendants' and the co-conspirators' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Illinois.

150.    Defendants' and their co-conspirators' agreement to uphold NAR rules, policies, and procedures related to buyer-agent compensation is *per se* unlawful under 740 ILCS 10/3(1) because Defendants and their co-conspirators agreed to fix the commissions to be paid to buyer-agents. Defendants' commission-fixing conspiracy was not reasonably necessary to any separate, legitimate business purpose, transaction, or collaboration.

151.    Defendants' and their co-conspirators' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services within Illinois.

152.    As a result of Defendants' and their co-conspirators' unlawful conduct, Plaintiff

and other members of the Illinois Subclass have been harmed by paying inflated prices for their homes and elevated buyer-agent commissions and by receiving lower quality or fewer services.

153. By engaging in the aforementioned conduct, Defendants and their co-conspirators intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*

154. Plaintiff and the other Illinois Subclass members seek damages as permitted by law for the injuries they suffered as a result of Defendants' and the co-conspirators' anti-competitive conduct.

155. Accordingly, with respect to Count II, Plaintiff, individually and on behalf of the proposed Illinois Subclass, prays for the relief set forth below.

## COUNT III
### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*
### (On Behalf of Plaintiff and the Illinois Subclass Members)

156. Plaintiff realleges and incorporates by reference each of the foregoing allegations as if fully set forth herein.

157. Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act provides in relevant part that:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

158. Plaintiff and the other members of the Illinois Subclass are "consumers" within the meaning of Section 1(e) of the ICFA. Defendants' and their co-conspirators' business activities

involve trade or commerce, are addressed to the market generally, and implicate consumer protection concerns.

159. Defendants' and their co-conspirators' conduct in misrepresenting its buyer-agents' services as being provided free of charge to buyers is a deceptive practice in violation of Section 2 of the ICFA.

160. As explained above, Defendants and their co-conspirators misrepresented to Plaintiff and the other Illinois Subclass members that:

    a. Their buyer-agents' services are provided free of charge to buyers;

    b. Buyer-brokers' commissions are paid by the seller; and

    c. Buyer-brokers' commissions must be paid uniformly regardless of the broker's experience, skill, or contribution to the homebuying process.

161. Additionally, Defendants and their co-conspirators deceptively omitted and concealed the amounts of buyer-agent commissions offered to potential buyer-agents on MLSs and concealed that listing software steered buyers toward properties with higher buyer-agent commissions.

162. Defendants and their co-conspirators intended that Plaintiff and the other Illinois Subclass members rely on their misrepresentations. Indeed, Defendants and their co-conspirators knowingly and intentionally made the deceptive representations as to buyer-agent commissions in order to maintain the commissions at an artificially elevated rate.

163. Plaintiff and the other Illinois Subclass members did actually rely upon and were actually deceived by Defendants' and their co-conspirators' misrepresentations. Plaintiff and the other members of the Illinois Subclass would have acted differently had they known that Defendants' and their co-conspirators' buyer-agent commissions were inflated, such as by, among other things, seeking out buyer-agents with discounted commissions or negotiating lower

commission rates.

164.     As a direct and proximate result of Defendants' and their co-conspirators' anti-competitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiff and the Illinois Subclass Members have been harmed and suffered actual damages through payment of higher prices for their homes and inflated buyer-agent commissions in exchange for lower quality of services.

165.     Further, Defendants' and their co-conspirators' violations of the Sherman Act, 15 U.S.C § 1, and the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*, constitute unfair business practices under the ICFA. Defendants' and their co-conspirators' actions unfairly imposed additional, unlawful costs on Plaintiff and the other Illinois Subclass members in the form of elevated home prices and excessive buyer-agent commissions. Defendants and their co-conspirators' actions are thus oppressive, unethical, and unscrupulous, and have caused substantial injury to consumers.

166.     Plaintiff brings this claim individually and on behalf of the other Illinois Subclass members pursuant to Section 10a of the ICFA, which permits Plaintiff to bring a private cause of action for the above violations and entitles Plaintiff and the other Illinois Subclass members to actual damages, injunctive relief, as well as costs and reasonable attorney's fees.

167.     Accordingly, with respect to Count III, Plaintiff, individually and on behalf of the proposed Illinois Subclass, prays for the relief set forth below.

## COUNT IV
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class Members)

168.     Plaintiff realleges and incorporates by reference each of the foregoing allegations as if fully set forth herein.

169.     Defendants and their co-conspirators received benefits from Plaintiff and the Class

44

members and unjustly retained those benefits at their expense. For example, Plaintiff and the Class members paid supracompetitive commissions to agents employed by Defendants or their co-conspirators. Defendants' and their co-conspirators' financial benefits resulting from their unlawful and inequitable conduct are economically traceable to overpayments for buyer-agent commissions by Plaintiff and the other Class members.

170. Additionally, Defendants and the co-conspirators promulgated and enforced anti-competitive rules, including the Mandatory Commission Rule, Commission Concealment Rules, Free-Service Rule, Non-Modification Rules, MLS Manipulation Practice and Lockbox Policy in order to raise, set, and maintain high commission rates and otherwise reduce competition in the market for buyer-agent services for its own gain, providing Defendants and their co-conspirators with economic, intangible, and other benefits.

171. Defendants and their co-conspirators unjustly retained those benefits at the expense of Plaintiff and the other Class members because Defendants' and their co-conspirators' conduct harmed Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff and the Class members.

172. The benefits that Defendants and their co-conspirators derived from Plaintiff and the other Class members rightly belong to Plaintiff and the other Class members. It would be inequitable under principles of equity and unjust enrichment for Defendants and their co-conspirators to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

173. Defendants and their co-conspirators should be compelled to disgorge in a common fund for the benefit of Plaintiff and the other Class members all unlawful or inequitable proceeds they received, and such other relief as the Court may deem just and proper.

174.     Accordingly, with respect to Count IV, Plaintiff, individually and on behalf of the proposed Class, prays for the relief set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of the other Class and Illinois Subclass members, prays that the Court enter an order:

A.     Certifying the Class and Illinois Subclass proposed above, appointing Plaintiff as class representative of the Class and Illinois Subclass, and appointing the undersigned counsel as class counsel;

B.     Declaring that Defendants' actions, as set forth in this Complaint, violate Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.     Declaring that Defendants' actions, as set forth in this Complaint, violate the Illinois Antitrust Act and the Illinois Consumer Fraud and Deceptive Business Practices Act;

D.     Awarding Plaintiff and the other members of the Class and Illinois Subclass all available damages and/or restitution in an amount to be determined at trial;

E.     Awarding Plaintiff pre- and post-judgment interest;

F.     Awarding Plaintiff his costs of suit, including reasonable attorney's fees and expenses;

G.     Awarding Plaintiff and the Class and Illinois Subclass an injunction to permanently enjoin and restrain the Defendants from maintaining or re-establishing the same or similar anti-competitive rules, policies, or practices as those challenged in this action in the future; and

H.     Awarding such further and additional relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury of all claims that can be so tried.

Dated: April 17, 2025                    Respectfully submitted,

                                         ALEANDRO LOPEZ, individually and on
                                         behalf of similarly situated individuals

By: */s/ Colin Primo Buscarini*
One of Plaintiff's attorneys

Evan Meyers
Paul T. Geske
William Kingston
Colin Primo Buscarini
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
emeyers@mcgpc.com
pgeske@mcgpc.com
wkingston@mcgpc.com
cbuscarini@mcgpc.com

Jonathan M. Jagher
FREED KANNER LONDON
& MILLEN LLC
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6487
jjagher@fklmlaw.com

Matthew W. Ruan
FREED KANNER LONDON
& MILLEN LLC
100 Tri-State International, Ste. 128
Lincolnshire, IL 60069
Tel: (224) 632-4500
mruan@fklmlaw.com

*Counsel for Plaintiff and the putative Class*
*and Subclass members*